FILED
**United States Court of Appeals**
**Tenth Circuit**

**April 1, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

KEPA MAUMAU,

    Defendant - Appellee.

No. 20-4056

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:08-CR-00758-TC-11)**
_____

Ryan D. Tenney, Assistant United States Attorney (John W. Huber, United States Attorney, with him on the briefs), Office of the United States Attorney, Salt Lake City, Utah, for Appellant.

John Gleeson (Farhana Choudhury, with him on the brief), Debevoise & Plimpton LLP, New York, New York, for Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **BACHARACH**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

In August 2008, defendant Kepa Maumau, who was twenty years old at the time, participated in armed robberies of a clothing store and two restaurants. Maumau was indicted for his role in those robberies and ultimately convicted by a jury of one count of

conspiracy to commit a racketeering offense, in violation of 18 U.S.C. § 1962(d), two counts of committing violent crimes in aid of racketeering, 18 U.S.C. § 1959(a), one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and three counts of using a gun during a crime of violence, in violation of 18 U.S.C. § 924(c) (2006).

At the time of Maumau's convictions, 18 U.S.C. § 924(c) included a "stacking" provision that required a district court to impose consecutive sentences of twenty-five years' imprisonment for second or subsequent convictions of the statute, even if those convictions occurred at the same time as a defendant's first conviction under the statute. As a result of that "stacking" provision, Maumau was sentenced to a total term of imprisonment of 55 years.

In December 2018, Congress enacted the First Step Act of 2018 (First Step Act), Pub. L. 115-391, 132 Stat. 5194 (2018). Three provisions of the First Step Act are relevant to this appeal. First, Section 403(a) of the First Step Act amended § 924(c) so that the twenty-five-year mandatory minimum sentence for a second or subsequent conviction of § 924(c) applies only if the defendant's first § 924(c) conviction is final at the time of the second or subsequent § 924(c) conviction. Second, Section 403(b) of the First Step Act limited the retroactivity of the changes implemented by Section 403(a). Third, Section 603(b) of the First Step Act aimed to increase the use and transparency of compassionate release by amending 18 U.S.C. § 3582(c)(1) to authorize defendants to file their own motions for compassionate release; prior to the First Step Act, only the Bureau of Prisons could file such motions on behalf of defendants.

2

In October 2019, Maumau filed a motion pursuant to § 3582(c)(1) to reduce his sentence. Maumau argued in his motion that extraordinary and compelling reasons, including the First Step Act's elimination of § 924(c)'s stacking provision, justified a reduction. The district court granted Maumau's motion and reduced Maumau's sentence to time served, plus a three-year term of supervised release.

The government now appeals, arguing that the district court erred in granting Maumau's motion. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the decision of the district court.

I

*Maumau's gang involvement and crimes*

Beginning in December 2002 and continuing at least until September 2008, law enforcement agencies in the State of Utah investigated the activities of persons associated with the Tongan Crip Gang (TCG). Aplt. App., Vol. 2 at 276. During that investigation, law enforcement officials identified Maumau as either a member or associate of TCG. *Id*.

In August 2008, Maumau, who was twenty years old at the time, and EK, a juvenile TCG member, robbed a Gen X clothing store in South Ogden, Utah.[1] During the robbery, which lasted approximately one minute, Maumau held a gun in his right hand, pointed it at the store's employees, and said, "Open the fucking cash register." *Id*. at 280.

---

[1] There is some dispute in the record regarding whether EK was involved in the Gen X robbery. There is no dispute, however, that EK was involved in the two robberies in Arizona. In any event, this dispute is immaterial to the issues in this appeal.

An employee opened the cash register, and EK took the money tray from the cash register and dumped it and its contents into a Gen-X bag. EK then asked about a second cash register, and a store employee opened the second register. EK also opened a metal box under the register and took cash from that box. Maumau walked to another part of the store and demanded that an employee give him several ball caps. Maumau and EK then walked out of the store, stopping briefly at a mannequin, from which they took a metal necklace. Maumau and EK left the store in a stolen van. Gen-X estimated its total loss to be approximately $7,000.

After robbing the Gen X Clothing store, Maumau and EK traveled to Tempe, Arizona, and robbed an El Pollo Loco restaurant. During that robbery, Maumau, who was wielding a handgun, jumped over the counter and told an employee behind the counter to give him all of the money from the register. Maumau pointed the gun at the employee and waived the gun up and down. Maumau then handed the gun to EK and took the money from the cash register drawer. After doing so, Maumau jumped back over the counter, and he and EK left the restaurant. Approximately $505 was taken during the robbery.

Maumau and EK then robbed a Jack in the Box restaurant down the street from the El Pollo Loco restaurant. During this robbery, EK first entered the restaurant and sat at a booth. A few moments later, Maumau entered the restaurant, made contact with the night manager, and walked with the night manager to the registers. At that point, EK walked to the counter, and both Maumau and EK pulled their shirts over their faces. Maumau

4

pulled a handgun out of his waistband and pointed the gun at the night manager. Maumau told the night manager, "you can open the register or I'll kill you." *Id*. at 281. As the night manager was unlocking the register, EK jumped over the counter and took the paper money out of the register and left the coins. EK observed a safe under the register and ordered the night manager to open it. The night manager did not have the combination to the safe and thus was unable to comply. Maumau and EK then left the restaurant. The night manager later told the police that he feared for his life when the gun was pointed at him.

Maumau and EK were chased by the police after leaving the Jack in the Box restaurant. Maumau crashed his vehicle two miles into the chase. He and EK tried to run, but were detained and arrested by police.

*Maumau's trial and sentencing*

A federal grand jury indicted Maumau, as well as other TCG members, on multiple criminal counts. For his part, Maumau was charged with violating: (1) 18 U.S.C. § 1962(d) (2006), conspiracy to commit a racketeering offense; (2) 18 U.S.C. § 1959(a) (2006), violent crimes in aid of racketeering (VICAR); (3) 18 U.S.C. § 1951(a) (2006), Hobbs Act Robbery; and (4) 18 U.S.C. § 924(c) (2006), using a gun during a crime of violence.

Prior to trial, the government offered Maumau a plea deal that, if accepted, would have resulted in a ten-year sentence. Maumau rejected the plea offer.

The case against Maumau proceeded to trial in October 2011. The jury convicted Maumau of eight counts. To begin with, the jury convicted Maumau of conspiring to commit a racketeering offense, and the jury identified the Gen X, El Pollo Loco, and Jack in the Box robberies as part of this conspiracy. For his part in the Gen X robbery, Maumau was also found guilty on one VICAR count, one Hobbs Act count, and one § 924(c) count. For the El Pollo Loco and Jack in the Box robberies, Maumau was found guilty of two more VICAR counts and two more § 924(c) counts.

Maumau was sentenced in December 2011 to 57 years in prison. At the time of Maumau's sentencing, 18 U.S.C. § 924(c)(1)(C) required the imposition of a 25-year mandatory minimum consecutive sentence for "a second or subsequent conviction under [§ 924(c)]," even if the second and subsequent convictions were part of the same prosecution as the first such conviction. 18 U.S.C. § 924(c)(1)(C) (2011); *see Deal v. United States*, 508 U.S. 129, 132 (1993). Thus, Maumau's 57-year sentence included a seven-year mandatory minimum sentence for the first § 924(c) conviction and twenty-five year mandatory minimum sentences for both the second and third convictions, with all of these sentences to run consecutively.

In 2013, Maumau was resentenced following the Supreme Court's decision in *Alleyne v. United States*, 570 U.S. 99 (2013) (holding that any fact that increases mandatory minimum sentence for a crime is an "element" of the crime that must be submitted to jury, and not a "sentencing factor"; further holding that a finding as to whether a defendant brandished, as opposed to merely carrying, a firearm in connection

6

with crime of violence was an element of a separate, aggravated offense that must be found by jury).  At the resentencing, the district court reduced the sentence for the first § 924(c) conviction from seven to five years.  This in turn reduced Maumau's total sentence from 57 to 55 years.

Maumau appealed his convictions and we affirmed.  *United States v. Kamahele*, 748 F.3d 984, 993, 1024 (10th Cir. 2014).

*The First Step Act*

In December of 2018, Congress passed the First Step Act.  As relevant here, the First Step Act substantially revised the sentencing scheme for § 924(c) convictions.  Specifically, Section 403(a) of the First Step Act amended § 924(c) so that a twenty-five-year mandatory minimum sentence for a second or subsequent § 924(c) conviction applies only if the defendant's first § 924(c) conviction is final at the time of the second or subsequent § 924(c) conviction.  Section 403(b) of the First Step Act, however, limited the retroactivity of the changes implemented by Section 403(a) to "any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment."  132 Stat. at 5222.  Finally, the First Step Act amended 18 U.S.C. § 3582(c)(1), sometimes referred to as the "compassionate release" statute, to allow defendants to file motions for sentence reduction on their own behalf.  Prior to the First Step Act, only the Director of the Bureau of Prisons (BOP) could file such motions.

*Maumau's motion to reduce sentence pursuant to § 3582(c)(1)*

On October 15, 2019, Maumau filed with the district court a motion to reduce sentence pursuant to 18 U.S.C. § 3582(c)(1).[2] Maumau argued in his motion that extraordinary and compelling circumstances existed that warranted a reduction in his sentence. To begin with, Maumau noted that Congress, by way of the First Step Act, had eliminated the practice of "stacking" sentences under § 924(c) and, in doing so, had titled the amendment "a 'Clarification of Section 924(c).'" Aplt. App., Vol. I at 119. "That fact alone," Maumau argued, "constitute[d] an extraordinary and compelling basis for a reduction of sentence." *Id*. Maumau also pointed to a variety of other factors that, he argued, warranted relief. These included: (a) the fact that "[h]e committed his crimes as a young man with no criminal record"; (b) the fact that "[n]o one was physically injured as a result of [his] crimes"; (c) "the victim of one of [his] crimes, Mr. Jaehen Cho, who was a witness at the trial, ha[d] voiced support for sentencing relief for Maumau"; (d) the fact that "Maumau's co-defendants—who were no less culpable—received far more lenient sentences" than Maumau; (e) at the time of his crimes, Maumau "was young, impressionable, and had sought guidance in all the wrong places"; (f) the fact that Maumau "struggled with alcohol and marijuana usage from the age of 14"; (g) Maumau's participation "in over 400 hours of educational and wellness courses" while in prison; (h)

---

[2] Prior to filing his motion, Maumau submitted a written request to the Warden of the United States Penitentiary–Pollock asking that he file a motion for reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1). According to the record, the Warden took no action in response to Maumau's request.

Maumau's participation "in the Challenge Program, a cognitive behavioral treatment program" for prisoners "focused on treating substance abuse and behavioral therapy"; (i) the fact that "multiple offers of employment . . . ha[d] already been extended to" Maumau in the event of his release; and (j) Maumau's "strong family support." *Id*. at 119–122. In addition, Maumau argued that the sentencing factors outlined in 18 U.S.C. § 3553(a) weighed strongly in favor of relief. Lastly, Maumau argued that he was deserving of "mercy and redemption." *Id*. at 125.

The government opposed Maumau's motion. The government argued that "because a jury convicted Maumau of multiple § 924(c) violations, Maumau was subject to a congressionally-mandated sentence of at least 55 years in prison." *Id.* at 126. The government in turn argued that "the Tenth Circuit has held that this very sentencing scheme is both constitutional and binding on the district courts, and Congress has recently declined to make any changes to that sentencing scheme retroactively applicable to defendants (like Maumau) who were sentenced before 2018." *Id.* In addition, the government argued that "under current and still-controlling law, Congress ha[d] tasked the Sentencing Commission, not the courts, with determining what constitutes an 'extraordinary and compelling reason' that can justify compassionate release," and "the reasons given by Maumau in his motion d[id] not align with any of the reasons given by the Commission." *Id.* at 128.

Maumau filed a reply brief arguing that his sentence was "indefensible" and bore "no relationship at all to the severity of the offense conduct." *Id.* at 170. Instead,

9

Maumau argued, "[f]orty-five years of [the sentence] was punishment not for that conduct, but for Maumau's decision to put the government to its proof." *Id.* Maumau also argued that, contrary to the government's arguments, "important events ha[d] occurred after Maumau's sentence was imposed," one of which was "the enactment of the First Step Act." *Id.* at 175. Maumau agreed with the government "that the First Step Act's amendment of § 924(c)" was "not a source of legal authority to reduce [his] sentence because it was not made retroactively applicable to cases in which a defendant had already been sentenced." *Id.* But, he argued, "it would be odd indeed to require judges to ignore that seismic amendment to § 924(c) when they consider applications for relief based squarely on other statutes, such as when they determine whether extraordinary and compelling reasons warrant a reduction under § 3582(c)(1)(A)(i)." *Id.* Maumau also argued that the government, despite opposing his motion for reduction on the grounds that he committed violent crimes, "was [previously] comfortable offering [him] a plea bargain that, if accepted, would have resulted in [his] release from prison years ago (considering good time)." *Id.* at 176.

On February 18, 2020, the district court issued an order and memorandum decision granting Maumau's motion to reduce sentence. The district court began its analysis by reviewing the Sentencing Commission's existing policy statement regarding motions for sentence reduction under § 3582(c)(1)(A). The district court concluded that the existing policy statement, by its own terms, was not applicable to motions for sentence reduction filed directly by defendants. The district court thus concluded that it

10

"ha[d] the discretion to provide . . . Maumau with relief, even if his situation d[id] not directly fall within the Sentencing Commission's [existing] policy statement." *Id*. at 186. In other words, the district court concluded that it had discretion "to determine whether there [wa]s an 'extraordinary and compelling reason' to reduce [Maumau's] sentence." *Id.* at 187. Turning to that question, the district court began by noting that it had "repeatedly expressed its concern regarding the length of [Maumau's] sentence." *Id.* The district court further noted that, with the First Step Act, "Congress eliminated the consecutive stacking previously required for violations of § 924(c)." *Id.* at 188. Ultimately, the district court concluded that "when considered together . . . Maumau's age, the length of sentence imposed, and the fact that he would not receive the same sentence if the crime occurred today all represent[ed] extraordinary and compelling grounds to reduce his sentence." *Id.* The district court acknowledged that Congress chose not to "ma[k]e its changes to § 924(c) retroactive," but concluded this was not dispositive. *Id.* at 191. The district court noted: "It [wa]s not unreasonable for Congress to conclude that not all defendants convicted under § 924(c) should receive new sentences, even while expanding the power of the courts to relieve some defendants of those sentences on a case-by-case basis." *Id.* (emphasis omitted).

After concluding that Maumau's sentence should be reduced, the district court noted that it needed to consider the § 3553(a) factors to "determine what type of new sentence would be appropriate." *Id.* at 192. In order to do so, however, the district court agreed with Maumau that "the best way for the court to determine an appropriate

11

sentence modification" was to have Maumau "brought to the district, where he c[ould] be interviewed by Probation and . . . have an opportunity to address the Court." *Id.* at 193 (quotations omitted).

On May 11, 2020, the district court held a telephonic hearing on Maumau's motion. The government asked the district court to modify Maumau's sentence to 301 months (25 years, 1 month), noting that this represented the low end of the advisory Guidelines sentencing range that was originally calculated in the presentence investigation report. Although the government asserted that its final pretrial plea offer to Maumau was for fifteen years' imprisonment, Maumau's counsel produced a pretrial letter from the government offering Maumau a ten year sentence in return for a plea deal. Maumau's counsel in turn argued that Maumau had "already served the equivalent of a 12-year sentence with good time," and he thus asked the district court to modify Maumau's sentence to time served. *Id.* at 259.

The district court decided to reduce Maumau's sentence to time served, plus a three-year term of supervised release. In doing so, the district court explained how it arrived at that sentence based upon consideration of the § 3553(a) factors. To begin with, the district court noted that in terms of sentencing disparities, reducing Maumau's sentence to fifteen years "would mean that . . . Maumau [would be] subjected to a longer sentence than his co-defendants, many of whom engaged in relatively similar misconduct but . . . received shorter sentences because of their respective plea agreements." *Id.* at 263. At the same time, the district court noted, reducing Maumau's sentence to less than

12

fifteen years would "mean[] that [he was] faring better than other defendants who commit the same crimes today." *Id.* Thus, the district court concluded, "no matter how [it] sentence[d]" Maumau, there would "be a disparity." *Id.* The district court next noted that it was "well aware of the severity of . . . Maumau's offenses, but [was] also aware that no one was injured during his crimes, and . . . believe[d] that was due in part to . . . Maumau's decisions." *Id.* at 264. The district court also "recognize[d] that although . . . Maumau was convicted of eight different counts, the manner in which he was charged in some ways ma[de] [his] crimes appear worse than they were because . . . the eight counts actually arose from just three robberies." *Id.* at 264–65. The district court also noted Maumau's young age at the time of the offenses of conviction, and it in turn found that he was unlikely to engage in dangerous conduct again and thus "w[ould] not place the public at risk again." *Id.* at 265. The district court stated that it was "very influenced by the fact that . . . Maumau ha[d] a strong support network outside of prison," and it noted that, based upon the numerous letters it had received in support of Maumau, "that . . . Maumau [wa]s hard working" and "intelligent . . . with the potential to contribute positively to his community . . . ." *Id.* The district court also noted that Maumau "ha[d] pending opportunities for employment and higher education," and it expressed "concern[] that these offers might not be available if he were to remain in prison for five or ten more years." *Id.*

The government filed a notice of appeal immediately following the district court's decision and also filed with this court a motion for an emergency stay of the district

13

court's decision. We granted the government's motion pending the outcome of its appeal.

## II

The government argues on appeal that "[t]he district court did not have authority to grant Maumau's request for compassionate release." Aplt. Br. at 15. In support, the government offers three related arguments. First, the government argues that "[t]he Sentencing Commission, not the courts, has power to determine what constitutes an 'extraordinary and compelling reason' for purposes of compassionate release." *Id*. at 16. Second, the government argues that "[u]nder the Sentencing Commission's controlling policy statement, a district court has no authority to grant compassionate release based on its disagreement with the length of a mandatory sentence." *Id*. at 35. Third, the government argues that "[t]he relevant legislative history and the structure of the modern sentencing system both confirm that a court cannot grant compassionate release based on its disagreement with the length of a mandatory sentence." *Id*. at 39. For the reasons that follow, we reject these arguments and, consequently, affirm the decision of the district court.[3]

### Standard of review

Because the arguments presented by the government require us to interpret § 3582(c)(1)(A) and determine the scope of the district court's authority thereunder, we

---

[3] We note the government does not challenge any of the district court's findings regarding the § 3553(a) factors or the length of the reduced sentence imposed.

apply a de novo standard of review.  *See United States v. Ansberry*, 976 F.3d 1108, 1126 (10th Cir. 2020); *United States v. White*, 765 F.3d 1240, 1245 (10th Cir. 2014); *United States v. Cobb*, 584 F.3d 979, 982 (10th Cir. 2009).

*Section 3582(c)(1) – history and text*

Before addressing the government's arguments on appeal, we begin by reviewing the history of §3582(c)(1), as well as its current text and the requirements that are effectively imposed by that text.

"Federal courts are forbidden, as a general matter, to modify a term of imprisonment once it has been imposed, but th[at] rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011) (internal quotation marks and citation omitted).  One such exception is contained in § 3582(c)(1).

Prior to 2018, § 3582(c)(1) only authorized the Director of the BOP to move for a reduction in a defendant's sentence.  In other words, from the enactment of § 3582(c)(1) in 1984 through late 2018, a defendant could not file a motion to reduce his or her sentence but was instead wholly dependent upon the Director of the BOP to file a motion on the defendant's behalf.

Between 1984 and 2013, the Director of the BOP used the process outlined in § 3582(c)(1) to release an average of twenty-four inmates per year.  *United States v. Rodriguez*, 451 F. Supp. 3d 392, 395 (E.D. Pa. 2020) (citing *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n*, 2016, statement of Michael E. Horowitz, Inspector General, Dep't of Justice).  In 2013, the

15

Office of the Inspector General reported that the BOP inconsistently implemented and poorly managed the compassionate release program, resulting in overlooked eligible inmates and terminally ill inmates dying while their requests were pending. *Id.*

Congress sought to address these issues by way of the First Step Act. Section 603(b) of the First Step Act, entitled "INCREASING THE USE AND TRANSPARENCY OF COMPASSIONATE RELEASE," modified § 3582(c)(1) to allow a defendant to directly file a motion for compassionate release with the district court after either exhausting administrative rights to appeal the Director of the BOP's failure to file such a motion, or the passage of 30 days from the defendant's unanswered request to the warden for such relief. *See* 132 Stat. at 5239.

As amended by the First Step Act, § 3582(c)(1) now provides, in pertinent part, as follows:

> (c) **Modification of an imposed term of imprisonment.--**The court may not modify a term of imprisonment once it has been imposed except that—
>
> > (1) in any case—
> >
> > > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

16

> (i) extraordinary and compelling reasons warrant such a reduction; . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A)(i).

Under the plain language of the statute, a district court may thus grant a motion for reduction of sentence, whether filed by the Director of the BOP or a defendant, only if three requirements are met: (1) the district court finds that extraordinary and compelling reasons warrant such a reduction; (2) the district court finds that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and (3) the district court considers the factors set forth in § 3553(a), to the extent that they are applicable.

The Sixth Circuit, in a recent decision, interpreted § 3582(c)(1)(A)(i) in this same manner and, in doing so, adopted what it described as a three-step test for "courts considering motions filed under § 3582(c)(1)." *United States v. Jones*, 980 F.3d 1098, 1107 (6th Cir. 2020). "At step one" of the test, the Sixth Circuit held, "a [district] court must 'find[]' whether 'extraordinary and compelling reasons warrant' a sentence reduction." *Id*. at 1107–08 (quoting § 3582(c)(1)(A)(i)). "At step two," the Sixth Circuit held, "a [district] court must 'find[]' whether 'such reduction is consistent with *applicable* policy statements issued by the Sentencing Commission.'" *Id*. at 1108 (emphasis in original) (quoting § 3582(c)(1)(A)). "At step three," the Sixth Circuit held, "'§ 3582(c)[(1)(A)] instructs a court to consider any applicable § 3553(a) factors and

17

determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case.'" *Id*. (quoting *Dillon v. United States*, 560 U.S. 817, 827 (2010)). Because this three-step test is consistent with the plain language of the statute, we adopt the test for use in this circuit.[4]

*Did the district court lack the authority to determine what constitutes "extraordinary and compelling reasons"?*

The premise of the government's first argument on appeal is that the district court, in carrying out step one of this three-part test, lacked the authority to determine *for itself* what constitutes "extraordinary and compelling reasons" for purposes of § 3582(c)(1)(A), and that, instead, the Sentencing Commission possesses the exclusive authority to define what constitutes "extraordinary and compelling reasons." For the reasons that follow, however, we reject the government's argument. We instead conclude that district courts, in carrying out step one of § 3582(c)(1)(A)'s three-part statutory test, possess the authority to determine for themselves what constitutes "extraordinary and compelling reasons," but that the discretion afforded to district courts in step one of the three-part

---

[4] Since *Jones*, the Sixth Circuit has clarified that "district courts may deny compassionate-release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others." *United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021). But when a "district court grants a motion for compassionate release, it must of course address all three steps." *United States v. Navarro*, 986 F.3d 668, 670 (6th Cir. 2021) (citing *Elias*, 984 F.3d at 519). As we recently noted in *United States v. McGee*, – F.3d – 2021 WL 1168980 (10th Cir. Mar. 29, 2021), we agree with this clarification.

18

statutory test is bounded by the requirement under step two of the statutory test that a reduction in sentence be consistent with applicable policy statements issued by the Sentencing Commission.

Section 3582(c)(1)(A)(i), as we have discussed, requires a district court considering a motion filed thereunder to find, under the first step of the statutory test, whether "extraordinary and compelling reasons warrant a sentence reduction." *Id*. at 1107–08 (quoting § 3582(c)(1)(A)(i)). But neither § 3582(c)(1)(A)(i), nor any other part of the statute, defines the phrase "extraordinary and compelling reasons" or indicates that the Sentencing Commission is charged with defining the phrase. That said, Congress has, in a different statute, directed the Sentencing Commission, as part of its statutory duties, to promulgate "general policy statements" regarding the appropriate use of the sentence modification provisions set forth in § 3582(c). 28 U.S.C. § 994(a)(2)(C). Congress has also directed the Sentencing Commission, in promulgating those general policy statements, to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). "Rehabilitation of the defendant alone," Congress has stated, "shall not be considered an extraordinary and compelling reason." *Id.*

The government argues that the language of § 994(t), particularly when considered in light of the statutory framework of § 3582(c)(1)(A)(i), affords the Sentencing Commission with the exclusive authority to determine what constitutes "extraordinary and compelling reasons" for purposes of § 3582(c)(1)(A)(i). In our view, however, the

19

more plausible interpretation of both § 994(t) and § 3582(c)(1)(A)(i) is that Congress intended to afford district courts with discretion, in carrying out the first part of the statutory test in § 3582(c)(1)(A)(i), to independently determine the existence of "extraordinary and compelling reasons," and for that discretion to be circumscribed under the second part of the statutory test by requiring district courts to find that a sentence reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Turning first to § 994(t), we note that Congress, in outlining the Sentencing Commission's duties, chose to employ the word "describe" rather than the word "define." The word "describe" is commonly defined to mean "to use words to convey a mental image or impression of (a person, thing, scene, situation, event, etc.) by referring to characteristic or significant qualities, features, or details." *Oxford English Dictionary Online* (3d ed. 2015), https://www.oed.com/view/Entry/50732 (last accessed Mar. 18, 2021). In contrast, the word "define" is commonly understood to mean "[t]o set bounds to, to limit, restrict, confine." *Id*., https://www.oed.com/view/Entry/48874 (last accessed Mar. 18, 2021). We presume that Congress was aware of the difference between these two words and knowingly chose to use the word "describe," rather than the word "define," in setting forth its statutory directive to the Sentencing Commission in § 994(t). *Cf. Bostock v. Clayton Cty*., 140 S. Ct. 1731, 1738 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment.").

20

Congress's choice of the word "describe" makes sense when considered in light of the fact that the specific duty imposed by § 994(t) is part of the Sentencing Commission's overarching duty to "promulgat[e] general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18." 28 U.S.C. § 994(t); *see* 28 U.S.C. §994(a)(2)(C). As Congress, the federal courts, and the Department of Justice have all long recognized, "general policy statements" differ from "substantive rules" or even "interpretative rules." *See generally* 5 U.S.C. § 553 (outlining rule-making procedures that apply to substantive rules, but not to general policy statements or interpretative rules); *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (holding that "interpretations contained in policy statements . . . do not warrant *Chevron*-style deference" and instead "are 'entitled to respect" under [the] decision in *Skidmore*"); *Chrysler Corp. v. Brown*, 441 U.S. 281, 301–02 (1979) (distinguishing "substantive rules" from "interpretative rules" and "general statements of policy"); *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (distinguishing "substantive rules," "general statements of policy" and "interpretative rules"); *Attorney General's Manual on the Administrative Procedure Act* (1947) (setting forth "working definitions" of "substantive rules," "interpretative rules," and "general statements of policy"). In particular, "general statements of policy" are issued by an agency to advise the public prospectively of the manner in which the agency intends for a discretionary power to be exercised, and thus differ from "interpretative rules," which are issued by an agency to advise the public of the agency's construction of the statutes it administers, as

21

well as from "substantive rules," which have the force or effect of law. *Am. Mining Cong.*, 995 F.2d at 1109 (citing *Attorney General's Manual on the Administrative Procedure Act*).

Congress's use of the word "describe" in § 994(t) is also consistent, we conclude, with the overall framework of § 3582(c)(1)(A). If, as the government asserts, Congress intended by way of § 994(t) to afford the Sentencing Commission with the exclusive authority to define the phrase "extraordinary and compelling reasons," that would mean that district courts, in carrying out the first step of § 3582(c)(1)(A)'s statutory test, would have to examine the Sentencing Commission's applicable policy statements to determine the meaning of the phrase "extraordinary and compelling reasons," and would in turn have to, in carrying out the second step of § 3582(c)(1)(A)(i)'s statutory test, return to those exact same policy statements to determine whether a reduction is "consistent with" those statements. The government's position would thus render the second part of § 3582(c)(1)(A)'s statutory test largely, if not entirely, superfluous. If, on the other hand, the Sentencing Commission's description of what constitutes "extraordinary and compelling reasons" is treated not as the equivalent of a statutory definition, but instead as a "general policy statement," the problem is avoided. District courts, in carrying out the first step of § 3582(c)(1)(A)'s statutory test, decide for themselves whether "extraordinary and compelling reasons" exist in a given case. Then, in carrying out the second step of § 3582(c)(1)(A)'s statutory test, district courts turn to the Sentencing Commission's applicable policy statements to determine whether a reduction is

"consistent with" those policy statements, including any descriptions given by the Sentencing Commission of what it considers to be "extraordinary and compelling reasons."

We therefore conclude that district courts, in applying the first part of § 3582(c)(1)(A)'s statutory test, have the authority to determine for themselves what constitutes "extraordinary and compelling reasons," but that this authority is effectively circumscribed by the second part of the statutory test, i.e., the requirement that a district court find that a reduction is consistent with applicable policy statements issued by the Sentencing Commission pursuant to §§ 994(a)(2)(C) and (t). In other words, we conclude that Congress did not, by way of § 994(t), intend for the Sentencing Commission to exclusively define the phrase "extraordinary and compelling reasons," but rather for the Sentencing Commission to describe those characteristic or significant qualities or features that typically constitute "extraordinary and compelling reasons," and for those guideposts to serve as part of the general policy statements to be considered by district courts under the second part of the statutory test in § 3582(c)(1)(A).

*Did the district court err in concluding that the existing policy statement issued by the Sentencing Commission was inapplicable to Maumau's motion for sentence reduction?*

In its second issue on appeal, the government argues that the district court erred in concluding that it was not bound by the Sentencing Commission's existing policy statement because that statement was issued prior to the First Step Act. According to the government, the Sentencing Commission's existing policy statement remains binding on

23

courts considering motions filed under §3582(c)(1)(A), including those filed directly by defendants such as Maumau. And the government in turn argues that, under the existing policy statement, "a district court has no authority to grant compassionate release based on its disagreement with the length of a mandatory sentence." Aplt. Br. at 35. For the reasons that follow, however, we reject the government's arguments.

As we have discussed, § 994(a)(2)(C) requires the Sentencing Commission to promulgate "general policy statements regarding . . . the sentence modification provisions set forth in section[] . . . 3582(c) of title 18." 28 U.S.C. § 994(a)(2)(C). The Sentencing Commission's most recent policy statement regarding sentencing reductions under § 3582(c)(1) was promulgated on November 1, 2018, slightly more than one month *before* the enactment of the First Step Act. That policy statement provides as follows:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1)(A) Extraordinary and compelling reasons warrant the reduction; or
>
> (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> (2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) The reduction is consistent with this policy statement.

24

U.S.S.G. § 1B1.13 (2018).

The Commentary to § 1B1.13, in obvious response to Congress's mandate to the Sentencing Commission in § 994(t) to "describe what should be considered extraordinary and compelling reasons for sentence reduction," provides as follows:

**1. Extraordinary and Compelling Reasons**.--Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
**(A) Medical Condition of the Defendant**.--
 (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
(ii) The defendant is--
(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process,
that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
**(B) Age of the Defendant**.--The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
**(C) Family Circumstances**.--
(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
**(D) Other Reasons**.--As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

**2. Foreseeability of Extraordinary and Compelling Reasons**.--For purposes of this policy statement, an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

**3. Rehabilitation of the Defendant**.--Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.

*Id.* cmt. 1-3.[5]

Although Congress's enactment of the First Step Act and its amendment of § 3582(c)(1) should have prompted the Sentencing Commission to revise the policy statement set forth in § 1B1.13, the Sentencing Commission has, to date, been unable to do so. The Sentencing Commission consists of seven voting members and, per statute, requires four members for a quorum to amend the guidelines. 28 U.S.C. §§ 991(a) (setting forth the number of members), 994(a) (requiring the vote of four members). Since the First Step Act was enacted, the Commission has had only two voting members. Thus, the Commission has been unable to comply with its statutory duty of promulgating a post-First Step Act policy statement regarding the appropriate use of the sentence reduction provisions of § 3582(c)(1)(A)(i).

---

[5] The remainder of the Commentary addresses the procedural aspects of the compassionate release statute as they existed prior to the First Step Act.

The government argues that the Sentencing Commission's existing policy statement § 1B1.13 remains binding on district courts, even in cases where the defendant, rather than the Director of the BOP, has moved for relief under § 3582(c)(1)(A). The problem with this position, however, is at least two-fold. First, it ignores the fact that the Sentencing Commission has failed to fulfill its statutory duty to issue a post-First Step Act policy statement recognizing the ability of defendants to file their own motions for sentence reduction. Second, and relatedly, it effectively undercuts the statutory changes that Congress made in the First Step Act when it authorized defendants to file their own motions. More specifically, treating the existing policy statement as continuing to be applicable would effectively eliminate, in all cases involving motions filed directly by defendants rather than the Director of the BOP, the "Other Reasons" (i.e., "catch-all") category that the Sentencing Commission clearly intended to exist. This is because the "catch-all" category, as described in the Sentencing Commission's existing policy statement, requires a determination by the Director of the BOP that extraordinary and compelling circumstances exist in a given case. But, in a case where the defendant has filed a motion for sentence reduction under § 3582(c)(1)(A), the Director of the BOP has necessarily *not* made any such determination. This is problematic and clearly undercuts not only Congress's intent to expand the use of compassionate release,[6] but also the

_____

[6] Although Congress undoubtedly knew that there would be some time lag between the time of the statutory changes it made with the First Step Act and the Sentencing Commission's issuance of a new policy statement recognizing those changes, it surely could not have known, and did not intend, that there would be a significant time

27

Sentencing Commission's intent to recognize a "catch-all" category of cases in addition to those that fall within the narrow confines of the first three categories of cases. Thus, we reject the government's position that § 1B1.13 remains binding on the district court when a defendant files a motion to reduce sentence under § 3582(c)(1)(A) directly with the district court. *See generally Dorsey v. United States*, 567 U.S. 260, 266 (2012) (noting that "federal sentencing statutes . . . interact[] with the Guidelines in an important way," and always "trump[] the Guidelines").

We conclude instead, as have the Second, Fourth, Sixth, and Seventh Circuits, that the Sentencing Commission's existing policy statement is applicable only to motions filed by the Director of the BOP, and not to motions filed directly by defendants. *See United States v. McCoy*, 981 F.3d 271, 281 (4th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *Jones*, 980 F.3d at 1109; *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020). "In other words, if a compassionate release motion is not brought by the BOP Director, Guideline § 1B1.13" would "not, by its own terms [be considered to] apply to it." *Brooker*, 976 F.3d at 236. "Because Guideline § 1B1.13 is not 'applicable' to compassionate release motions brought by defendants, Application Note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling." *Id*.

---

lag, or that the Sentencing Commission would fail altogether to issue a new policy statement.

28

We therefore agree with the district court that under the second part of § 3582(c)(1)(A)'s test, its finding that extraordinary and compelling reasons warranted a reduction in Maumau's case was not constrained by the Sentencing Commission's existing policy statement, U.S.S.G. § 1B1.13.

*Did the district court grant relief to Maumau based upon its disagreement with the length of his mandatory sentence?*

In its third and final issue, the government argues that, "[i]n addition to the controlling [statutory] texts, the relevant legislative history and the structure of the sentencing system also show that a court cannot use the compassionate release statute to override a mandatory sentence based on the court's disagreement with the required length" of such a sentence. Aplt. Br. at 39-40. The underlying premise of this argument is that the district court in the case at hand granted relief to Maumau based upon its disagreement with the length of his statutory sentence.

We reject the government's argument because its underlying premise is incorrect. Nothing in the district court's decision indicates that the district court granted relief to Maumau based upon its general disagreement with the mandatory sentences that are required to be imposed in connection with § 924(c) convictions. Nor was the district court's decision based solely upon its disagreement with the length of Maumau's sentence in particular. Rather, the district court's decision indicates that its finding of "extraordinary and compelling reasons" was based on its individualized review of all the circumstances of Maumau's case and its conclusion "that a combination of factors"

29

warranted relief, including: "Maumau's young age at the time of" sentencing; the "incredible" length of his stacked mandatory sentences under § 924(c); the First Step Act's elimination of sentence-stacking under § 924(c); and the fact that Maumau, "if sentenced today, . . . would not be subject to such a long term of imprisonment."[7] Aplt. App. at 191.

## III

The amended judgment of the district court is AFFIRMED. This court's order of June 1, 2020, granting the government's motion for emergency stay pending appeal is VACATED.

---

[7] We note, in passing, that the Fourth Circuit recently approved of the very type of individualized analysis that the district court in this case conducted. More specifically, the Fourth Circuit concluded that it was permissible for district courts to "treat[] as 'extraordinary and compelling reasons' for compassionate release the severity of the defendants' § 924(c) sentences and the extent of the disparity between the defendants' sentences and those provided for under the First Step Act." *McCoy*, 981 F.3d at 286.

20-4056, *United States v. Maumau*

**TYMKOVICH**, C.J., concurring.

I agree with the majority opinion that as revised by the First Step Act, the compassionate release statute allows district courts to determine the existence of extraordinary and compelling reasons for defendant-filed motions without BOP involvement. Until the Sentencing Commission updates its guidance, there is no "applicable policy statement," 18 U.S.C. § 3582(c)(1)(A)(i), that constrains the district court's discretion to consider whether a defendant-filed motion satisfies the "extraordinary and compelling" standard.

I write separately, however, to note that our holding does not give district courts carte blanche to retroactively apply in every instance the amendments to the stacking provision in 18 U.S.C. § 924(c). Congress, after all, chose *not* to make those amendments retroactive. *See United States v. Hunt*, 793 F. App'x 764, 766–67 (10th Cir. 2019) (stating Congress "plainly addressed [the amendment's] retroactivity, strictly limiting its backward reach"). A long sentence derived from stacking cannot, by itself, be an "extraordinary and compelling" reason for sentence reduction. *See, e.g., United States v. Tomes*, – F.3d –, 2021 WL 868555, at *4 (6th Cir. Mar. 9, 2021) ("[W]e will not render § 401(c) useless by using § 3582(c)(1)(A) as an end run around Congress's careful effort to limit the retroactivity of the First Step Act's reforms."); *see also United States v. McGee*, – F.3d – 2021 WL 1168980, at *13 (10th Cir. Mar. 29,

2021). ("[O]nly . . . the combination of such a sentence and a defendant's unique circumstances . . . constitute 'extraordinary and compelling reasons' for purposes of § 3582(c)(1)(A)(i)."). Indeed, the imposition of a sentence that was not only permissible but statutorily required at the time is neither an extraordinary nor a compelling reason to now reduce that same sentence. Instead, a district court may consider the legislative change to the stacking provision only in the context of an individualized review of a movant's circumstances. *See United States v. McCoy*, 981 F.3d 271, 286 (4th Cir. 2020).

Cases in which those circumstances warrant a finding of "extraordinary and compelling reasons" should be relatively rare. As the majority opinion makes clear, the district court's finding in this case was based on "an individualized review of all the circumstances of Maumau's case." Maj. Op. at 29. Those circumstances included: (1) Maumau's extraordinarily long sentence, especially in comparison to the significantly shorter sentences Maumau's co-defendants received for substantially similar conduct; (2) the government's plea offer before trial was only 10 years; and (3) Maumau's young age at the time of his sentence.

Because the district court considered these individualized circumstances in conjunction with the length of the stacked sentence, it acted within its broad discretion to find "extraordinary and compelling" reasons for sentence reduction. Had it relied only on its distaste for Maumau's long stacked sentence, the district

court would have substituted its own judgment for that of Congress and thus abused its discretion. Because it did not, I concur in the judgment.