*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-CO-542

UNITED STATES, APPELLANT,

V.

EUGENE R. FACON, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(1998-FEL-002984)

(Hon. José M. López, Trial Judge)

(Argued September 22, 2022                    Decided January 26, 2023)

*Daniel J. Lenerz*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb* and *Adam Braskich*, Assistant United States Attorneys, were on the brief, for appellant.

*Hillary S. Smith*, with whom *Allanté Keels* and *Matt Jones* were on the brief, for appellee.

*Daniel Gonen*, Public Defender Service, with whom *Samia Fam*, *Alice Wang*, *Mikel-Meredith Weidman*, and *Paul Maneri*, Public Defender Service, were on the brief for Public Defender Service, *amicus curiae*, in support of appellee.

Before DEAHL, *Associate Judge*, and THOMPSON and GLICKMAN,[*] *Senior Judges*.

GLICKMAN, *Senior Judge*: In 1999, the Superior Court sentenced appellee Eugene Facon to life imprisonment without parole following his convictions for armed kidnapping, first-degree sexual abuse while armed, and other offenses. In December 2020, Facon filed a motion for compassionate release pursuant to D.C. Code § 24-403.04. That statute directs a court to "modify a term of imprisonment imposed upon a defendant" if the court determines that (1) the defendant is "not a danger to the safety of any other person or the community," and (2) the sentence modification is warranted by "extraordinary and compelling reasons," which

---

[*] Judge Glickman was an Associate Judge at the time of argument. His status changed to Senior Judge on December 21, 2022.

typically are reasons of a medical nature.[1]  The defendant bears the burden of proving each of these preconditions to relief by a preponderance of the evidence.[2]

---

[1] In pertinent part, D.C. Code § 24-403.04 provides:

(a) Notwithstanding any other provision of law, the court shall modify a term of imprisonment imposed upon a defendant if it determines the defendant is not a danger to the safety of any other person or the community, pursuant to the factors to be considered in 18 U.S.C. §§ 3142(g) and 3553(a) and evidence of the defendant's rehabilitation while incarcerated, and:

* * *

(3) . . . [E]xtraordinary and compelling reasons warrant such a modification, including:

(A) A debilitating medical condition involving an incurable illness, or a debilitating injury from which the defendant will not recover; [or]

(B) Elderly age, defined as a defendant who:

(i)    Is 60 years of age or older;

(ii)    Has served the lesser of 15 years or 75% of the defendant's sentence; and

(iii)    Suffers from a chronic or serious medical condition related to the aging process or that causes an acute vulnerability to severe medical complications or death as a result of COVID-19; . . . .

[2] *See Autrey v. United States*, 264 A.3d 653, 659 (D.C. 2021); *Bailey v. United States*, 251 A.3d 724, 729-30 (D.C. 2021).

Over the government's opposition, the judge to whom the motion was assigned granted the motion based on findings that Facon no longer poses a danger to anyone and is medically eligible for early release from prison because of his "heightened susceptibility to the extreme consequence of contracting COVID-19."

The United States has appealed. It argues that the motion judge erred in finding Facon medically eligible for release without requiring him to show that he remains "acutely vulnerable" to severe illness or death from COVID-19 despite having been vaccinated against the disease. The United States also contends the judge abused his discretion in finding that Facon would not be "a danger to the safety of any other person or the community" if released. We granted the government's motion to stay the order releasing Facon pending our resolution of its appeal.

The threshold issue we confront is the issue of our appellate jurisdiction. This is the first government appeal of a compassionate release order to come before this court; the compassionate release cases we have considered in the past all were appeals by defendants from denials of relief. Facon and *amicus curiae* the Public Defender Service (PDS) argue that we must dismiss the appeal for lack of jurisdiction because no statute expressly permits the United States to appeal Superior

Court orders granting compassionate release. In response, the United States argues that two statutes do authorize such government appeals: D.C. Code § 23-104(d-2), which allows government appeals in criminal cases of orders "granting the release of a person . . . convicted . . . of an offense," and D.C. Code § 11-721(a)(1), which gives this court jurisdiction over appeals of "all final orders and judgments of the Superior Court." Alternatively, the government argues that even if a direct appeal of a compassionate release order is not permitted by either of those statutes, we should treat its brief as a petition for a writ of mandamus to correct a sentence modification that exceeded the Superior Court's authority under D.C. Code § 24-403.04.

In this opinion we examine the two jurisdictional statutes on which the government relies and conclude that D.C. Code § 11-721(a)(1) confers appellate jurisdiction in this case. An order or judgment granting a motion for compassionate release is "final" within the meaning of that statute. And although § 11-721(a)(1) does not authorize government appeals in criminal cases as a general matter, a

compassionate release order is sufficiently independent of and collateral to the underlying criminal prosecution to be appealable under § 11-721(a)(1).[3]

On the merits, we agree with the government that the motion judge, who did not have the benefit of this court's subsequent decision in *Autrey v. United States*,[4] did not apply the proper legal standard set forth in that case in determining Facon's medical eligibility for release. We therefore must vacate the order granting Facon's compassionate release motion and remand for consideration of whether Facon has shouldered his burden of showing he is acutely vulnerable to severe illness or death from COVID-19 despite having been vaccinated. As to whether the judge abused his discretion in finding that Facon is no longer dangerous, we agree with the government that the judge's explanation for that finding is unclear and raises serious questions that make it less than convincing. However, we refrain from holding that the judge erred in determining that Facon's release will not endanger any other person or the community, inasmuch as a new, up-to-date assessment of Facon's

---

[3] In view of this conclusion, we have no occasion in this opinion to address the government's alternative argument that we may grant mandamus relief.

[4] 264 A.3d 653 (D.C. 2021).

current dangerousness will be necessary on remand before his motion can be granted.

**I.**

At Facon's 1999 trial in Superior Court, the prosecution presented evidence that, on an afternoon in April 1998, Facon attacked K.L., a 24-year-old woman who was a complete stranger to him, in the parking garage at her place of work. Facon approached K.L. from behind, demanded her car keys, slashed her hand and chest with a 10-inch blade, and threatened to kill her if she did not get into the car with him. When K.L. screamed for help and fought to escape, Facon grabbed her by the hair, pulled her into the car, and slammed her head on the dashboard. He drove K.L. to a park, raped her at knifepoint, took her money, and then left her there as he drove off in her car. The jury convicted Facon of armed kidnapping, first-degree sexual abuse while armed, armed carjacking, armed robbery, assault with a dangerous weapon, and threatening to injure a person.

Facon perpetrated these crimes just six weeks after he was released on parole following ten years in prison for two unrelated armed robberies he had committed in 1987. Facon also had a history of substance abuse and had been using cocaine

daily for several years prior to his commission of those robberies. Although he participated in substance abuse treatment while in prison, he tested positive for cocaine use within two weeks of his release on parole and again on the day after he attacked K.L.

On July 23, 1999, the trial judge sentenced Facon to two consecutive terms of life imprisonment without eligibility for parole (LWOP) for armed kidnapping and first-degree sexual abuse while armed, and an additional 18⅓ to 55 years in prison for the other offenses of conviction. This court affirmed Facon's convictions on direct appeal in 2008[5] and affirmed the denial of his first collateral challenge to his convictions (alleging ineffective assistance of trial counsel) in 2011.[6] In early 2020, Facon appealed the trial court's denial of a second post-conviction motion, in which he challenged the legality of his LWOP sentences.[7]

---

[5] *Facon v. United States*, No. 99-CF-1204, Mem. Op. & J. (D.C. Dec. 1, 2008).

[6] *Facon v. United States*, No. 09-CO-1241, Mem. Op. & J. (D.C. Aug 4, 2011).

[7] *Facon v. United States*, No. 20-CO-236.

The latter appeal was still pending on December 30, 2020, when Facon moved in Superior Court for compassionate release pursuant to D.C. Code § 24-403.04.  By then he had served 22 years, eight months, and two days of his sentence.  In support of a finding that he was no longer dangerous, Facon cited the length of time he had spent in prison; his age (57 at the time he filed the motion), renewed religious faith, and strong family ties; his lack of substance or alcohol use since 2004; and his conduct and activities during his incarceration, including his limited disciplinary history (a total of 12 infractions in 22 years, the most recent of which was in 2011), consistent employment, and voluntary participation in Narcotics Anonymous and institutional programming.  To establish his medical eligibility for compassionate release, Facon argued that he had five risk factors — his age, type 2 diabetes, obesity, hypertension, and hepatitis C — that increased his likelihood of experiencing severe consequences from COVID-19 and therefore constituted "extraordinary and compelling reasons" warranting his early release within the meaning of D.C. Code § 24-403.04(a)(3).

The United States opposed Facon's motion.  While noting that he soon would be offered a COVID-19 vaccine, the government acknowledged that the Centers for Disease Control and Prevention had concluded that obesity, Type 2 diabetes, and,

possibly, hypertension increase the risk of severe illness from COVID-19. (The government disputed the significance of Facon's other claimed risk factors.) But the United States argued that Facon remained dangerous and had failed to demonstrate otherwise. As evidence of his disqualifying dangerousness, the government emphasized the nature and circumstances of his offenses against K.L.; his criminal history, including the fact that he committed his crimes against K.L. within only six weeks of his release on parole after serving ten years in prison for armed robberies; his history of cocaine use and insufficient drug rehabilitation; his disciplinary violations while serving time, which included not only several minor incidents (e.g., insolence) but also an assault with serious injury in 2002, threatening bodily harm in 2002, possession of intoxicants in 2003 and 2004, and fighting with another inmate in 2011; and his minimal program participation (only 284 hours in nearly 23 years, an average of less than 13 hours a year[8]). The government also represented that Facon had refused sex offender treatment (which Facon disputed). In addition, the government reported that Facon's victim, K.L., strongly opposed his release; she

---

[8] The government pointed out that 170 of Facon's programming hours were completed in what was then the last year of his imprisonment, 2020, and that between July 2009 and January 2020, Facon had completed only 114 hours of programming.

had written a letter saying she remained scarred by the attack and deserved the peace of mind of knowing Facon was not at liberty.

On March 8, 2021, the motion judge issued an indicative order stating he would grant Facon's motion for compassionate release if this court enabled him to do so by remanding Facon's then-pending case on appeal.[9] The judge explained that Facon was eligible for release because of his "heightened susceptibility to the extreme consequence of contracting COVID-19." The possibility that Facon would soon be vaccinated against COVID did not change that conclusion, the judge said, because the vaccines only "diminished" but did not "extinguish[]" the chance of severe illness.

On the main issue disputed by the government, the judge found that the nature and circumstances of Facon's crimes against K.L. "show[ed] his potential dangerousness to the community" and weighed against releasing him, especially because the "severity of the crime itself [was] among the worst." The judge likewise found that Facon's previous criminal history and heavy cocaine usage, "as well as

---

[9] *See* Super. Ct. Crim. R. 37.

the fact that 10 years in prison did so little to rehabilitate him in the past," weighed "heavily against his release." But despite those indicia of dangerousness, several considerations persuaded the judge that Facon had been "sufficiently rehabilitated" to justify granting his motion for compassionate release.

First, the judge cited the fact that Facon "admits the seriousness of his offenses, but notes that substance abuse was a contributing factor to his criminal behavior." On that score, the judge found it significant that Facon, while serving his sentence in prison, had "voluntarily participated in a [N]arcotics [A]nonymous program and ha[d] not used or possessed illegal drugs or alcohol since 2004." Second, the judge cited Facon's maintenance in prison of "consistent employment from food services to carpentry," his completion of 284 hours of "coursework" (including vocational training, life skills education, and behavioral therapy), his "limited disciplinary infractions," and "[t]he amount of time since any severe disciplinary infraction." The judge acknowledged the government's representation that Facon had "at least twice been offered and refused sex offender treatment," but noted that Facon denied having been offered such treatment. The judge did not resolve this factual dispute. Third, the judge cited Facon's "claims to have also found renewed religious faith while incarcerated," and his "close relationships with

family members" who "love and care for him deeply" and had come forward to offer him their support upon his release. Lastly, the judge mentioned Facon's "advanced age [and] poor health," as factors that made recidivism less likely. Taking everything into consideration, and admittedly having "some hesitation" due to the nature of Facon's crimes and his history, the judge found that the "balance favors the conclusion that [Facon] does not" pose a danger to anyone or the community.

By this time, unbeknownst to the motion judge, Facon already had received both doses of the Pfizer COVID-19 vaccine.[10] The United States promptly moved for reconsideration, informing the judge of Facon's vaccination and asserting that Facon no longer could show extraordinary and compelling reasons for his release in light of the efficacy of the vaccine in preventing severe illness or death from COVID. Facon opposed the motion for reconsideration. He also asked this court per Criminal Rule 37(b) to remand his pending post-conviction appeal case to allow the Superior Court to grant the relief it indicated it would grant if empowered to do so.

---

[10] Facon received his second dose of the vaccine a few days before the judge issued his indicative ruling on March 8, 2021. Prior to that ruling, neither party had informed the motion judge that Facon had been vaccinated.

On April 26, 2021, the motion judge denied the government's motion for reconsideration. "There is still uncertainty," the judge explained,

> regarding the efficacy of the Pfizer vaccine against variants of the COVID-19 virus, the long-term efficacy of the vaccine, as well as how the vaccine affects individuals with Mr. Facon's particular risk factors. The Pfizer vaccine, or any other available treatment or mitigation tactics, is not 100% effective at preventing infection or serious complications. Risk appears to remain, but it has been reduced to an unknown degree.

In May 2021, a division of this court granted Facon's motion to remand his post-conviction appeal. The United States filed a motion to stay the modification of Facon's sentence pending its anticipated appeal of the forthcoming compassionate release order. Facon opposed the stay. In August 2021, the motion judge granted Facon's motion for compassionate release by suspending the execution of the remainder of his prison term. Although the judge initially expressed his intent to place Facon on five years of supervised *probation*, the amended judgment and commitment order thereafter issued by the judge placed Facon on five years of supervised *release* instead. The judge denied the government's stay motion.

The United States appealed and moved this court to stay the amended judgment. Facon, joined by PDS as *amicus curiae*, moved to dismiss the appeal for

lack of jurisdiction in the absence of proper statutory authorization. We denied the motion to dismiss, granted the government's motion for a stay, ordered that the appeal be expedited, and directed the parties to address the issue of our jurisdiction in their briefs.[11]

---

[11] Facon argues that an additional reason we must dismiss the appeal for lack jurisdiction is the deficiency of the government's notice of appeal. When the government filed its appeal in August 2021, D.C. App. Rule 3(c)(1)(B) required a notice of appeal to "designate the judgment, order, or part thereof being appealed." Facon argues that the government failed to comply with this requirement because its notice designated only the motion judge's orders granting compassionate release and denying the motion for reconsideration, without also designating the judge's final order — the separate amended judgment imposing sentence. This patently benign oversight does not deprive us of jurisdiction, however, nor does it otherwise justify dismissal of the appeal. As we have explained, Rule 3 does not demand that an appellant "always be impeccably precise in meeting D.C. App. R. 3(a)'s requirement to designate the judgment or order appealed from in order for jurisdiction to exist." *Perry v. Sera*, 623 A.2d 1210, 1215 (D.C. 1993). Rather, we have been guided by the principle that "a mistake in designating the judgment appealed from should not bar appellate jurisdiction so long as the intent to appeal the particular judgment can be inferred and the appellee is not prejudiced or misled." *Id.* (citation omitted). Moreover, as Facon concedes, effective December 1, 2021, Rule 3 was amended to specify that "[a]n appeal may not be dismissed . . . for failure to properly designate the judgment if the notice of appeal was filed after entry of the judgment and designates an order that merged into that judgment." D.C. App. R. 3(c)(7). In the absence of any conceivable prejudice to Facon, we decline to penalize the United States for the omission of the amended judgment in its notice of appeal.

## II. Appellate Jurisdiction

This and other courts appear to treat proceedings on post-conviction motions for compassionate release from prison sentences as being criminal rather than civil in nature, at least for some purposes.[12] That treatment implicates the oft-repeated

---

[12] *See Bailey v. United States*, 251 A.3d 724, 729 n.2 (D.C. 2021) (explaining that a prisoner seeking compassionate release has the burden of showing non-dangerousness by a preponderance of the evidence, because while "a preponderance standard is the default rule *in civil cases*, its rationale applies to criminal cases when, like here, the legislature has placed an evidentiary burden on the defendant rather than the government"); *United States v. Long*, 997 F.3d 342, 353 (D.C. Cir. 2021) (holding that the Federal Rules of Criminal Procedure compel application of plain error review to unpreserved arguments in compassionate release appeals).

The characterization of compassionate release proceedings as criminal proceedings is arguably in tension with the "civil" categorization of seemingly analogous proceedings, such as parole revocation proceedings and collateral attacks on convictions in the nature of habeas corpus. If we viewed compassionate release proceedings the same way — for example, as essentially a form of "judicial parole" — the government's right to appeal would not be in issue. *See, e.g.*, *United States v. Robinson*, 388 A.2d 469, 470 n.1 (D.C. 1978) (affirming jurisdiction to hear government appeal from trial court order granting a D.C. Code § 23-110 motion to correct a sentence, citing the government's recognized right to appeal in habeas corpus cases due to their civil nature as described in *United States v. Williamson*, 255 F.2d 512 (5th Cir. 1958)); *Trenkler v. United States*, 536 F.3d 85, 94-95 (1st Cir. 2008) (holding that coram nobis proceedings are appealable as civil matters even when they are ancillary to criminal proceedings, and that the government therefore may appeal the grant of a writ of coram nobis pursuant to 28 U.S.C. § 1291); *United States v. Marmolejo*, 915 F.2d 981, 982-83 (5th Cir. 1990) (holding that the government may appeal from supervised release revocation hearings pursuant to 28 U.S.C. § 1291, as they partake of the same characteristics as parole

proposition that "the government has no right of appeal in a criminal case unless there is express legislative authorization."[13]  Unfazed, the United States argues that

---

and probation revocation proceedings).  However, the government has not urged us to view compassionate release proceedings for appellate jurisdictional purposes the same way we view collateral challenges to convictions and parole proceedings.

For all the foregoing reasons, we shall proceed on the assumption that post-conviction compassionate release proceedings are criminal proceedings.

[13] *District of Columbia v. Whitley*, 640 A.2d 710, 712 (D.C. 1994) (citing *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 568 (1977)).  The judicial articulation of this constraint on appeals by the United States in criminal cases arose out of double jeopardy concerns.  *See, e.g.*, *Kepner v. United States*, 195 U.S. 100, 133 (1904).  Double jeopardy principles do not bar the government's appeal in the present case, however.  *See, e.g.*, *United States v. DiFrancesco*, 449 U.S. 117, 132 (1980) ("The Double Jeopardy Clause is *not* a complete barrier to an appeal by the prosecution in a criminal case.  '[W]here a Government appeal presents no threat of successive prosecutions, the Double Jeopardy Clause is not offended.'  From this it follows that the Government's taking a review of respondent's sentence does not itself offend double jeopardy principles just because its success might deprive respondent of the benefit of a more lenient sentence." (quoting *Martin Linen Supply Co.*, 430 U.S. at 569-70) (alteration in original) (citations omitted)).

Facon has argued that he has a legitimate expectation, protected by the Double Jeopardy Clause, that his modified sentence would be final and hence not appealable by the government.  This argument is unavailing.  For one thing, a defendant cannot expect finality in a sentence that the government is statutorily authorized to appeal and has appealed.  *Herring v. United States*, 169 A.3d 354, 359 (D.C. 2017) (citing *DiFrancesco*, 449 U.S. at 139).  Moreover, while this court has acknowledged that a defendant may acquire a legitimate expectation of finality in a sentence when he begins serving it, *see Smith v. United States*, 687 A.2d 581, 583 (D.C. 1996), Facon never began serving his modified sentence, as the release order was stayed and Facon has remained in prison.

either D.C. Code § 23-104(d-2) or D.C. Code § 11-721(a)(1) provides the authorization it needs to appeal an order granting compassionate release. We consider each of those statutes in turn, beginning with the more specific one.

**A. D.C. Code § 23-104(d-2)**

D.C. Code § 23-104 allows the United States and the District of Columbia to appeal specified types of orders and decisions in criminal and delinquency cases. Subsection (d-2) states:

> In a criminal or delinquency case, the United States or the District of Columbia may appeal a decision or order entered by the trial court granting the release of a person charged with, or convicted or adjudicated delinquent of an offense, the denial of a motion for revocation of release, or modification of the conditions of release.

The United States argues that the plain language of this subsection authorizes its appeal in this case because Facon was "a person . . . convicted . . . of an offense," and the order modifying his sentence effectively granted his "release" from prison. Facon and PDS argue that the government misreads the statute, and that it does not authorize governmental appeals of sentencing orders in general, or modifications of prison sentences under the compassionate release statute in particular. Rather, they

contend, the text, history, and purpose of § 23-104(d-2) reveal that the provision is limited to "bail" orders, i.e., orders that temporarily release defendants (or juvenile respondents) from custody pending trial, sentencing, or appeal.[14]

The proper interpretation of § 23-104(d-2) is a question we decide de novo.[15] When we construe a statute, our objective "is to ascertain and give effect to legislative intent."[16] "We first look to see whether the statutory language at issue is 'plain and admits of no more than one meaning.'"[17] We presumptively will give effect to statutory language that truly "is unambiguous and does not produce an absurd result."[18] We recognize, however, that "even where the words of a statute

---

[14] *See* D.C. Code § 23-1302 ("As used in this chapter — . . . (2) the term 'bail determination' means any order by a judicial officer respecting the terms and conditions of detention or release (including any order setting the amount of bail bond or any other kind of security) made to assure the appearance in court of . . . (A) any person arrested in the District of Columbia; or (B) any material witness in any criminal proceeding in a court referred to in paragraph (1) of this section.").

[15] *See Facebook, Inc. v. Wint*, 199 A.3d 625, 628 (D.C. 2019).

[16] *Grayson v. AT&T Corp.*, 15 A.3d 219, 237 (D.C. 2011) (en banc) (citation omitted).

[17] *Facebook*, 199 A.3d at 628 (quoting *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc)).

[18] *McNeely v. United States*, 874 A.2d 371, 387 (D.C. 2005) (citation omitted).

have a 'superficial clarity,' a review of the legislative history or an in-depth consideration of alternative constructions that could be ascribed to statutory language may reveal ambiguities that the court must resolve."[19]  It thus is "a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[20] And "we may also look to the legislative history to ensure that our interpretation is consistent with legislative intent."[21]

In this case, the government's "plain language" reading of § 23-104(d-2) may have a superficial appeal, but we conclude there are compelling reasons to reject it. To begin with, the context in which the word "release" is used in § 23-104(d-2) and elsewhere in Title 23 ("Criminal Procedure") is not the judicial imposition or modification of criminal sentences, a subject that is covered elsewhere, in Title 24

---

[19] *Peoples Drug Stores*, 470 A.2d at 754.

[20] *Lopez-Ramirez v. United States*, 171 A.3d 169, 172 (D.C. 2017) (citation omitted).

[21] *Facebook*, 199 A.3d at 628 (citation omitted).

of the D.C. Code ("Prisoners and Their Treatment").[22]  The primary discussion of "release" in Title 23 is in Chapter 13, Subchapter II ("Release and Pretrial Detention"),[23] and the term is used there solely in connection with provisions governing the temporary, conditional release of defendants from custody pending trial, sentencing, or direct appeal (i.e., "bail").  Thus, when § 23-104(d-2) speaks of allowing the government to appeal an order "granting . . . release," or the denial of a motion for "revocation of release," or the modification of "the conditions of release," the statute is naturally read as referring only to the temporary, conditional release of defendants authorized in Chapter 13.[24]

---

[22] *See, e.g.*, D.C. Code §§ 24-403.01 ("Sentencing, supervised release, and good time credit for felonies committed on or after August 5, 2000"), 24-403.03 ("Modification of an imposed term of imprisonment for violations of law committed before 25 years of age") and 24-403.04 ("Motions for compassionate release for individuals convicted of felony offenses").

[23] *See* D.C. Code tit. 23, ch. 13, subchapter II ("Release and Pretrial Detention"), §§ 23-1321 to -1333.

[24] Chapter 19 of Title 23 ("Crime Victims' Rights") also employs the term "release."  It does so in connection with victims' rights with respect to both judicial and non-judicial proceedings.  We understand that when addressing the rights of victims to be notified of, and present, at court proceedings, Chapter 19 uses "release" in the limited ("bail") sense it is used in Chapter 13.  For example, D.C. Code § 23-1901(b)(4) provides that a crime victim has the general right to "[b]e present at all court proceedings related to the offense, including the sentencing, and release, parole, record-sealing, and post-conviction hearings," thus distinguishing "release" decisions from other, non-bail decisions (including sentencing and sentence-

D.C. Code § 24-403.04 itself lends no support to the government's argument that § 23-104(d-2) authorizes the present appeal as one from a decision granting "release." The text of § 24-403.04 does not use the word "release" in connection with the power it grants the Superior Court to "modify a term of imprisonment." We do not attach significance to the fact that the section title refers to "motions for compassionate release." Titles often "are of limited utility" in construing statutory language,[25] and in this case, the title is misleading. As the Second Circuit said of the federal counterpart of § 24-403.04, "compassionate release is a misnomer. [The statute] in fact speaks of sentence reductions."[26] Although sentence modifications

---

modification decisions) that also may result in a prisoner's discharge from custody. *See also id.*, §§ 23-1901(b)(7), -1902(c)(2)(E), -1904(a). It is true that Chapter 19 uses the term "release" to mean non-bail decisions when addressing non-judicial decisions that result in a convicted defendant's discharge from custody; for example, D.C. Code § 23-1902(d)(2) states that "[a]fter trial, a responsible official" shall notify a crime victim of the "[e]scape, work release, furlough, or any other form of release from custody of the offender" (e.g., supervised release, which we discuss further *infra*). *See also id.*, §§ 23-1902(c)(2)(G), -1904(d). However, this non-bail meaning in non-judicial proceedings is immaterial to our interpretation of D.C. Code § 23-104(d-2), because that statute authorizes appeals by the government only from trial court release decisions.

[25] *Facebook*, 199 A.3d at 629.

[26] *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) (explaining that under the federal compassionate release statute, as under the District's statute, the court has discretion to grant relief short of immediate release from imprisonment).

granted under § 24-403.04 often do result in a defendant's prompt release from prison, they need not do so. Courts granting "compassionate release" motions have exercised their discretion to "reduce but not eliminate a defendant's prison sentence."[27] We thus cannot conclude that, merely by employing the term "release," § 23-104(d-2) includes sentence modifications authorized by § 24-403.04.

Nor, we note, does § 23-104(d-2) appear to be referring to "supervised release," the fixed period of supervision a defendant is required to serve after completing a prison sentence for a felony committed on or after August 5, 2000.[28] The Superior Court does not enter a decision or order "granting" supervised release; the term of supervised release is imposed at the outset as part of the original

---

[27] *Id.*; *see also United States v. Curry*, No. ELH-17-0387, 2021 U.S. Dist. LEXIS 7016, at *26 (D. Md. Jan. 14, 2021) ("Numerous district courts in both this Circuit and others have found that a court 'need not choose between immediate, unconditional release or no relief at all' and have, accordingly, granted sentence reductions that did not result in immediate release." (citing cases)).

[28] *See* D.C. Code § 24-403.01(b)(1). Appellant's offenses were committed prior to August 5, 2000, so the supervised release provision is inapplicable to him.

sentence.[29]  And the court has no authority to revoke supervised release or modify

its conditions; those decisions are committed to the U.S. Parole Commission.[30]

Digging further, we are persuaded that the derivation and legislative history

of § 23-104(d-2) contradict the government's interpretation of the statute.  When the

Council enacted § 23-104(d-2) in 2007,[31] it drew its text directly and virtually

verbatim from the third paragraph of 18 U.S.C. § 3731, the federal statute permitting

government appeals from certain rulings in criminal cases.  That paragraph allows

the United States to appeal from, *inter alia*, "a decision or order, entered by a district

court of the United States, granting the release of a person charged with or convicted

of an offense, or denying a motion for revocation of, or modification of the

conditions of, a decision or order granting release."  This provision was added to

§ 3731 by the Bail Reform Act of 1984,[32] and its legislative history confirms that its

---

[29] *Id.*

[30] *Id.* §§ 24-403.01(b)(6), 24-133(c)(2).

[31] Omnibus Public Safety Amendment Act of 2006, D.C. Law 16-306, § 224(a), 53 D.C. Reg. 8610 (effective Apr. 24, 2007).

[32] Bail Reform Act of 1984, Pub. L. No. 98-473, tit. II, ch. I, § 205, 98 Stat. 1837 (Oct. 12, 1984).

purpose was only to allow the government to appeal decisions releasing defendants temporarily pending trial, sentencing, or direct appeal.[33]  And that is how the federal courts of appeals have construed the provision.  "As used in section 3731," the Second Circuit explained in 2005 (well *before* the Council imported the federal language into § 23-104(d-2)), "the term 'release' refers to a temporary period when a criminal defendant is permitted to remain free from detention while awaiting trial, sentencing, or appeal."[34]  The Council's adoption of § 3731's language implies it

---

[33] *See* SEN. REP. NO. 98-225, at 4 (1983) (using "release" rather than "bail" in the provisions of "this chapter," which includes 18 U.S.C. § 3145, to "distinguish between money bond (i.e., 'bail') and conditional release (often referred to 'release on bail')"); *id.* at 30 & n.93 ("[S]ection 3145, in conjunction with the amendment to 18 U.S.C. 3731 would specifically authorize the government, as well as the defendant, to seek review and appeal of release decisions. . . . The Department of Justice urged that the government be granted specific authority to seek review of release decisions to the same extent that such authority is given [to] defendants, and the Committee agrees . . . as a matter of both basic fairness and sound policy," because of the "clear public interest in permitting review of release orders which may be insufficient to prevent a defendant from fleeing or committing further crimes"); H.R. REP. NO. 98-1121, at 15 & n.4 (1984) (explaining that then-current law did not authorize the government to appeal from "bail decisions"); *see also id.* at 30, 32.

[34] *United States v. Peterson*, 394 F.3d 98, 102 (2d Cir. 2005) (holding that § 3731 did not authorize a government appeal from the dismissal of a probation violation petition, because "[p]robation is a criminal sentence, not a period of release prior to trial, sentencing, or appeal"); *accord United States v. Hundley*, 858 F.2d 58, 62 (2d Cir. 1988) (stating that the provision of § 3731 at issue "plainly limits appeals by the United States to [orders] relating to the temporary release of a person charged or convicted of an offense").  *See also United States v. Chaudhry*, 630 F.3d 875,

shared the federal courts' interpretation of it.[35]  The government points to nothing in the legislative history of § 23-104(d-2) suggesting otherwise.[36]

---

880-81 (9th Cir. 2011) (stating that "[t]he language of § 3731 only permits the government to appeal bail decisions" and citing *Peterson* and the decisions of other circuits that pre-date the Council's use of § 3731's language for § 23-104(d-2)).

[35] *Meiggs v. Associated Builders, Inc.*, , 635 (D.C. 1988) ("When a local provision is borrowed directly from a federal statute, the Council [of the District of Columbia] is presumed to have borrowed the judicial construction thereof as well. This 'local' version takes its origin from the cardinal rule of statutory construction that when a legislature adopts a statute that is modeled after one in effect in another jurisdiction, the legislature is deemed to have adopted as well the judicial constructions of the statute in the jurisdiction in which it originated." (alteration in original) (internal citations omitted)); *see also* OMNIBUS PUBLIC SAFETY ACT, Report on Bill 16-247 before the Committee on the Judiciary, Council of the District of Columbia, at 154 n.13 (Apr. 28, 2006) (attaching testimony from Robert J. Spagnoletti, D.C. Attorney General, which refers to 18 U.S.C. § 3731).

Similarly, and even though the Council could not have relied on federal court decisions rendered after it enacted § 23-104(d-2), we find it compelling that no reported federal decision has relied on § 3731 to permit an appeal of a compassionate release order by the government.

[36] Rather, the legislative history of the statute indicates that subsection (d-2) was adopted at the behest of the Office of the Attorney General for the sole purpose of giving that Office the same right to appeal bail decisions that the United States Attorney's Office (USAO) already possessed under D.C. Code § 23-1324(d). (That section is clearly limited to bail appeals.)  The USAO itself acknowledged the redundancy of subsection (d-2) (as far as it was concerned) in a letter from the Special Counsel to the U.S. Attorney to the Chairperson of the Committee on the Judiciary.  Report on Bill 16-247 before the Committee on the Judiciary, *supra* note 35 at 368 (Apr. 28, 2006) (attaching letter from Patricia A. Riley, Special Counsel to the USAO); *see also id.* at 155, 244-45 (attaching testimony and letter from Robert J. Spagnoletti, D.C. Attorney General).  To ensure that the government's ability to

For these reasons, we conclude that the government's reliance on § 23-104(d-2) for authorization of the instant appeal is misplaced. We turn to consider whether we have jurisdiction over the appeal under D.C. Code § 11-721(a)(1).

## B. D.C. Code § 11-721(a)(1)

D.C. Code § 11-721(a)(1) provides that the District of Columbia Court of Appeals has jurisdiction of appeals from "all final orders and judgments of the Superior Court of the District of Columbia." This provision is based on 28 U.S.C. § 1291, which provides that the federal courts of appeals have jurisdiction of appeals from "all final decisions" of the federal district courts. Under either statute, a trial court order either denying or granting a motion for compassionate release under

---

appeal codified in (d-2) did not go any further than the existing appeal right in § 23-1324, PDS suggested to the Committee that it amend § 23-1324 instead. *Id.* at 268, 344 (attaching letters from Avis E. Buchanan, Director, and Laura E. Hankins, Special Counsel to the Director, PDS). But the Committee ultimately rejected PDS's concerns, found that the "DC Attorney General's explanation [wa]s reasonable," and did not recommend any changes to the government appeal provision of the bill. *Id.* at 6.

District of Columbia or federal law[37] is a "final" order because it disposes of the issues in the case before the court "so that the court has nothing remaining to do."[38] Pursuant to § 11-721(a)(1), this court routinely has exercised jurisdiction over prisoners' appeals from orders denying compassionate release.[39] Federal courts of appeals likewise have held that orders denying compassionate release are final orders appealable under 28 U.S.C. § 1291 "because they close the criminal case once again."[40] And the federal appellate courts that already have addressed the

---

[37] *See* D.C. Code § 24-403.04(a)(3); 18 U.S.C. § 3582(c)(1)(A)(i). The District's compassionate release statute is also modeled on its federal counterpart, and in construing our statute, we have looked to federal cases construing the federal compassionate release statute for guidance. *See Bailey v. United States*, 251 A.3d 724, 729-30 (D.C. 2021).

[38] *Rolinski v. Lewis*, 828 A.2d 739, 746 (D.C. 2003) (en banc) (citation omitted); *see also, e.g.*, *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989) ("For purposes of [28 U.S.C. § 1291], a final judgment is normally deemed not to have occurred until there has been a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." (internal quotation marks and citations omitted)).

[39] *See, e.g.*, *Autrey v. United States*, 264 A.3d 653, 654 (D.C. 2021); *Page v. United States*, 254 A.3d 1129, 1129-30 (D.C. 2021); *Griffin v. United States*, 251 A.3d 722, 722-23 (D.C. 2021); *Bailey*, 251 A.3d at 728. As there has been no prior challenge to this court's jurisdiction in compassionate release appeals, it is unsurprising that our decisions have not discussed the statutory source of that jurisdiction.

[40] *United States v. Long*, 997 F.3d 342, 350, 352 (D.C. Cir. 2021) (citation omitted) (holding that § 1291 provides appellate jurisdiction over orders denying

jurisdictional issue now before us have concluded they also have jurisdiction under 28 U.S.C. § 1291 over government appeals from orders *granting* compassionate release.[41] The consensus view in the federal courts is, we believe, "that § 1291, which gives us broad authority to hear 'appeals from all final decisions of the district courts of the United States,' is a better fit for compassionate release motions" than 18 U.S.C. § 3742, the statute that authorizes both defendants and the government to appeal otherwise final sentences in four specified circumstances.[42]

---

compassionate release and collecting cases from "many" courts of appeals reaching the same conclusion).

[41] *See United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022) ("[W]e review both grants and denials of compassionate release pursuant to an abuse of discretion standard. Only § 1291 affords us the power to do that." (citation omitted)); *United States v. Maumau*, 993 F.3d 821, 824 (10th Cir. 2021) ("The government now appeals, arguing that the district court erred in granting Maumau's motion. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the decision of the district court."). Other circuit courts have exercised appellate jurisdiction over government appeals and vacated or reversed district court orders granting compassionate release without explicitly discussing the statutory basis for doing so. *E.g.*, *United States v. Trenkler*, 47 F.4th 42, 46 (1st Cir. 2022); *United States v. Bass*, 17 F.4th 629, 635 (6th Cir. 2021).

[42] *Ferguson*, 55 F.4th at 267; *see also United States v. Lowe*, 136 F.3d 1231, 1233 (9th Cir. 1998) (explaining that § 3742 does not authorize an appeal that challenges a district court's discretionary decision on a motion to reduce a sentence).

Thus, there appears to be ample authority supporting the government's position that we have jurisdiction over the present appeal under our statutory counterpart of § 1291, D.C. Code § 11-721(a)(1). This conclusion, however, warrants additional explanation because, in general, § 1291 does not authorize government appeals in criminal cases.[43] Neither, as a general matter, does § 11-721(a)(1). This has long been settled. In *Carroll v. United States*,[44] the Supreme Court — emphasizing that government appeals in criminal cases are "not favored"[45] — held that § 1291 did not enable the government to appeal an order suppressing crucial evidence, even though it effectively was a "final order" because it ended the government's ability to proceed with its prosecution.[46] Relying on that decision, this court held in *United States v. Stokes*[47] that § 11-721(a)(1) did not authorize the government to appeal a putatively unlawful criminal sentence, even though the sentencing order concluded the prosecution and thus was a final order.[48]

---

[43] *See Arizona v. Manypenny*, 451 U.S. 232, 245-47 (1981).

[44] 354 U.S. 394 (1957).

[45] *Id.* at 400.

[46] *Id.* at 403-05.

[47] 365 A.2d 615 (D.C. 1976).

[48] *Id.* at 617.

But *Carroll* and *Stokes* recognized an exception that we conclude applies to appeals of orders granting compassionate release to prisoners under sentence. The opinions in both cases acknowledged that "certain orders relating to a criminal case may be found to possess sufficient independence from the main course of the prosecution to warrant treatment as plenary orders, and thus be appealable [by the government as well as the defendant] on the authority of" the final order statute, 28 U.S.C. § 1291 or D.C. Code § 11-721(a)(1).[49] As an example of a "sufficiently independent" and final order that the government (or the defendant) may appeal under § 1291, *Carroll* cited an order setting the amount of a defendant's bail.[50] The Court deemed such an order sufficiently distinct from the "main course of the prosecution" to be appealable even though it applies while the prosecution still is in progress.

Since *Carroll*, "a number of courts have ruled that section 1291 provides appellate jurisdiction in criminal cases when the issue on appeal is sufficiently

---

[49] *Carroll*, 354 U.S. at 403; *see Stokes*, 365 A.2d at 617.

[50] 354 U.S. at 403.

distinct from the underlying criminal proceeding."[51]  We already have cited federal decisions involving government appeals from compassionate release grants.  We take additional guidance from the Second Circuit's examination of the jurisdictional issue in *United States v. Peterson*.  In that case, the government appealed a district court ruling dismissing its petition for a probation violation hearing.  The Second Circuit, applying the reasoning of *Carroll*, concluded that the appeal was authorized by § 1291 even though it arose in a criminal case and concerned a possible modification of the sentence Peterson then was serving.[52]  The court explained this conclusion thusly:

---

[51] *United States v. Peterson*, 394 F.3d 98, 103 (2d Cir. 2005).  *See also* 15B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3919.2 (2d ed., 2022 update) (explaining that, for government appeals in criminal cases, the second "largest category of appeals are supported by the general final decision appeal jurisdiction of § 1291" and "[m]any of the appeals are rather easily explained on the ground that the underlying district court proceedings are detached from the criminal prosecution itself, either because the prosecution has not yet begun or because it has finished"); *id.* at § 3919.8 ("Matters that seem sufficiently separate from the central process of imposing sentence will at times be held appealable, more likely under the general final decision provision of § 1291 than the more limited language of § 3731.").

[52] *Peterson*, 394 F.3d at 103-05.  Of course, if the court had concluded that the appeal did *not* arise in a criminal case, there would have been no question of its jurisdiction under § 1291.

> The District Court's determination that Peterson did not violate the terms of his probation had nothing to do with the merits of Peterson's criminal conviction. . . . Nothing the District Court could have done in response to the government's petition would in any way have affected, or even called into question, the validity of Peterson's underlying conviction or the validity of the sentence imposed by the District Court.

> When a district court order has no effect on the merits of the underlying criminal prosecution or sentence, it is 'truly collateral to the criminal prosecution.' Accordingly, we have no difficulty concluding that a district court's determination that a defendant has or has not violated a condition of probation ordinarily is a decision collateral to the main course of criminal prosecution and therefore appealable under section 1291.[53]

Much the same analysis demonstrates that an order granting post-conviction compassionate release to a prisoner is sufficiently independent of and "collateral to the main course of [the] criminal prosecution" to be appealable by the United States under §11-721(a)(1). A compassionate release order does not affect or call into question the factual or legal "validity" of the prisoner's criminal conviction or the sentence that was imposed. Rather, the order is independent of and collateral to the prosecution because it is based on new findings, at a later point in time, as to the prisoner's dangerousness and eligibility for compassionate release.

---

[53] *Id.* at 104-05 (citation omitted).

Facon and PDS argue that a compassionate release order under D.C. Code § 24-403.04 is nonetheless a sentencing order, and that the government's appeal of such an order pursuant to §11-721(a)(1) therefore is foreclosed by this court's holding in *Stokes*. We do not agree. *Stokes* held that §11-721(a)(1) does not authorize the government to appeal from the initially imposed sentence that concludes the prosecution.[54] The case did not address the appealability of an independent post-conviction order, such as an order under D.C. Code § 24-403.04, that merely modifies a previously imposed sentence in light of conditions and events that developed after the prosecution is over. Facon and PDS err in characterizing a post-conviction sentence modification under the compassionate release statute as "a

---

[54] In *Stokes* the United States sought to appeal the imposition of a Federal Youth Corrections Act sentence on a defendant convicted of first-degree felony murder. 365 A.2d at 616.

resentencing in all but name."[55] In *Dillon v. United States*,[56] the Supreme Court emphasized "the fundamental differences between sentencing and sentence-modification proceedings."[57] Like the statutory provision before the Court in *Dillon*, the compassionate release statute authorizes "only a limited adjustment to an otherwise final sentence" when specific qualifying circumstances are established.[58]

---

[55] Brief of PDS at 15 n.9 (quoting *Williams v. United States*, 205 A.3d 837, 849 (D.C. 2019)). *Williams* discussed the Incarceration Reduction Amendment Act of 2016 (IRAA), a statute quite different from § 24-403.04 in scope and intent. Appellate jurisdiction of government appeals from grants of sentencing relief under the IRAA was not at issue or discussed in *Williams*, and we express no view on that question in the present opinion. That said, we note that, in contrast to the compassionate release statute, the IRAA expressly provides for plenary judicial reconsideration of lengthy sentences imposed on juvenile offenders; it does so, we noted, with the specific goal of "effectively converting each such sentence into one with multiple realistic and meaningful possibilities of release while the offender still has years of life left." *Id.* Given the breadth of the mandated judicial inquiry, we observed that "[a]lthough review under the IRAA is not denominated 'resentencing,' it would seem to equate to a resentencing in all but name." *Id.* The same cannot be said of proceedings on motions under the more restrictive compassionate release statute.

[56] 560 U.S. 817 (2010).

[57] *Id.* at 830 (holding retroactive amendments to federal sentencing guidelines applied in sentence modification procedures under 28 U.S.C. § 3582(c)(2) binding and not advisory like the sentencing guidelines are when applied during initial sentencing).

[58] *Id.* at 826.

Accordingly, the court's inquiry in a compassionate release hearing is considerably narrower than the inquiry in an initial sentencing or a resentencing; notably, as we have held, a number of factors that are appropriately considered in fashioning a defendant's sentence, such as concerns about general deterrence, promoting respect for the law, victim restitution, and imposing just and commensurate punishment, are not properly considered in deciding whether to modify a previously imposed term of imprisonment under D.C. Code § 24-403.04 because they do not bear on the defendant's present dangerousness or eligibility for compassionate release.[59]  Thus, such a modification is "not a plenary resentencing proceeding;" it "does not impose a new sentence in the usual sense."[60]  Rather, "[a]ll a decision on the application for compassionate release does is operate upon and modify—or leave unchanged—an

---

[59] *See Bailey v. United States*, 251 A.3d 724, 731-33 (D.C. 2021).  In *Bailey* this court explained that factors appropriately considered in the initial determination of a defendant's sentence "are relevant to compassionate release decisions only insofar as they inform the determination of a prisoner's present or future dangerousness."  *Id*. at 732.  So, for example, "[w]here a defendant is eligible for early release and found to be non-dangerous, there is simply no room in the statutory scheme for concerns about general deterrence and victim restitution to trump those determinations."  *Id.*  *See also Griffin v. United States*, 251 A.3d 722, 723 (D.C. 2021).

[60] *Dillon*, 560 U.S. at 826-27.

already-existing and already-imposed sentence."[61]  Therefore, we hold that, unlike the initial sentence or a resentencing, and like the bail order discussed in *Carroll*, a compassionate release order "possess[es] sufficient independence from the main course of the prosecution to warrant treatment" as an appealable collateral order within the purview of § 11-721(a)(1).

### III. Facon's Eligibility for Compassionate Release

We review the determination of a prisoner's medical eligibility for compassionate release for abuse of discretion.[62]  The United States argues that the motion judge exercised his discretion erroneously by basing his determination of Facon's post-vaccination eligibility for release on an incorrect legal standard.  Facon and PDS disagree; they argue that the judge did not abuse his discretion in relying

---

[61] *United States v. Long*, 997 F.3d 342, 352 (D.C. Cir. 2021).

[62] *See Autrey v. United States*, 264 A.3d 653, 659 (D.C. 2021); *see also Page v. United States*, 254 A.3d 1129, 1130 (D.C. 2021) ("The legislative history shows that the Council of the District of Columbia intended for trial courts to exercise 'appropriate discretion to review the compelling facts of a case,' Committee on the Judiciary & Pub. Safety, Council of the District of Columbia, Report on Bill No. 23-127 ('Committee Report') at 28-29 (Nov. 23, 2020), and thus afforded them discretion to consider any reasonable factor that directly impacts on the determination of whether an applicant is 'at risk of severe illness or death from COVID-19.'").

on uncertainty as to the efficacy of vaccination to justify his ruling, and that evidence in the record supports a finding that Facon remained acutely vulnerable to severe illness or death from COVID-19 even after being vaccinated. We conclude that the judge did apply an erroneous legal standard in assessing Facon's medical eligibility, and that a remand is required for the judge as trier of fact to reassess that issue in light of the correct standard.

The motion judge initially concluded that Facon made the showing required by D.C. Code § 24-403.04(a)(3)(B)(iii) — a showing that "extraordinary and compelling reasons" warranted a modification of his sentence based on his "acute vulnerability to severe medical complications or death as a result of COVID-19" — because his "overall characteristics" demonstrated he had a "heightened susceptibility to the extreme consequence of contracting COVID-19." The judge reasoned that the "possibility that Mr. Facon [will] receive a vaccine for COVID-19 [did] not detract from the other factors considered" because, while the "chances of his suffering severe illness [would be] diminished, they [would] not [be] extinguished" by vaccination. After the judge was informed that Facon had received both doses of the Pfizer COVID-19 vaccine, he ruled that this fact did not alter his decision because it did not eliminate Facon's "heightened susceptibility":

> There is still uncertainty regarding the efficacy of the Pfizer vaccine against variants of the COVID-19 virus, the long-term efficacy of the vaccine, as well as how the vaccine affects individuals with Mr. Facon's particular risk factors. The Pfizer vaccine, or any other available treatment or mitigation tactics, is not 100% effective at preventing infection or serious complications. Risk appears to remain, but it has been reduced to an unknown degree.

The judge's analysis is inconsistent with the standard we subsequently articulated in *Autrey*, that a vaccinated prisoner must show "that he remains 'acutely vulnerable'" to severe illness or death from COVID-19 "despite being vaccinated."[63] While we did not offer a "precise definition" of "acute vulnerability," we said in *Autrey* that "it requires more than an 'above-average' risk, as compared to the general population" — more, clearly, than the motion judge's metric of "heightened susceptibility" — since the word "acute" implies the risk must be "serious, urgent, and demanding attention; intensified or aggravated nearly to a crisis, culmination, or breaking point: extreme, severe, critical."[64] The motion judge's focus on the uncertainty of the vaccine's effectiveness also improperly shifted the burden to the

---

[63] 264 A.3d at 659.

[64] *Id.* at 659 n.13 (quoting *Webster's Third New International Dictionary Unabridged* 23 (2020)).

government to disprove that Facon's risk factors made him acutely vulnerable to severe illness or death. "[I]t is the prisoner's burden to demonstrate some acute vulnerability to severe illness or death from COVID-19 despite being vaccinated, not the government's burden to disprove it, and not the trial court's obligation to independently research the matter."[65] To make the necessary showing, "a prisoner cannot rely on the mere possibility of residual risks without evidence that those risks actually exist, apply to the prisoner, and rise to the level of an acute vulnerability" even though the prisoner has been vaccinated.[66] And the judge therefore cannot base a decision to grant a compassionate release motion on "the mere possibility of residual risks."

Rather than relying on uncertainties, the judge in the present case needed to make particular findings regarding whether Facon's evidence proved that his risk factors rendered him "acutely" vulnerable to severe illness or death from COVID-19 in prison even after vaccination, so as to constitute "extraordinary and compelling circumstances" warranting his release or other modification of his term of

---

[65] *Id.* at 659.

[66] *Id.*

imprisonment. On the existing record, we are not prepared to hold that only one answer can be given to this question as a matter of law. We therefore must remand the case for reconsideration of Facon's medical eligibility under the legal standard articulated in *Autrey*.

## IV. The Issue of Facon's Dangerousness

The United States argues that the motion judge also abused his discretion in finding Facon is "not a danger to the safety of any other person or the community, pursuant to the factors to be considered in 18 U.S.C. §§ 3142(g) and 3553(a) and evidence of [his] rehabilitation while incarcerated."[67] Facon responds that the judge exercised his discretion properly by fully considering the record and relying only on the relevant statutory factors.[68]

Like the question of Facon's medical eligibility for compassionate release, the question of his current dangerousness is not one we are prepared to resolve one way or the other as a matter of law on the existing record; the most we could say is

---

[67] D.C. Code § 24-403.04(a).

[68] *See Bailey*, 251 A.3d at 731-33.

whether the motion judge properly addressed the dangerousness issue. In light of our conclusion that the case must be remanded anyhow for a new determination of Facon's eligibility, we exercise our discretion to refrain from deciding whether the judge also erred in finding him not dangerous. Whether or not the judge did so err when he rendered his decision in 2021, an up-to-date assessment of Facon's dangerousness will be necessary on remand before his motion can be granted. The motion judge should consider any new evidence the parties introduce regarding Facon's present dangerousness.

That said, we think it important to add that we find the reasoning behind the judge's finding of non-dangerousness to be unclear, and we explain why with the hope that the rationale for any determination of the question on remand will be more pellucid. On the one hand, we understand the judge to have found that Facon's violent crimes against K.L. ("among the worst," the judge said), his other criminal history, and the striking fact that "10 years in prison did so little to rehabilitate him" before he attacked K.L. right after being paroled, all "weigh[ed] *heavily* against his release." It is not clear to us why the judge nonetheless concluded — with "some hesitation," as he said — that Facon is "sufficiently rehabilitated" and no longer dangerous. Although the judge recited the parties' arguments and enumerated

certain facts he took into consideration in reaching that conclusion, he did not clearly explain how those facts outweighed the evidence of Facon's dangerousness and actually showed that Facon was rehabilitated.

For example, the judge highlighted Facon's claim that "substance abuse was a contributing factor to his criminal behavior," and that while in prison he had participated in a Narcotics Anonymous program and had not used or possessed illegal drugs or alcohol since 2004. But the judge did not explain why these bare facts supported a finding that Facon would not be dangerous if he were no longer incarcerated and under close supervision. It is not clear, and the judge did not find, that Facon overcame his substance abuse problems in prison and would be unlikely to relapse if drugs once again became available to him. Nor is it clear how Facon's substance abuse can be said to have contributed to (or otherwise mitigated) the extremely violent crimes perpetrated against a complete stranger (kidnapping K.L., slashing her with a knife, and raping her) that raised the gravest concerns about his "potential dangerousness." In that regard, the judge gave inexplicably short shrift to the government's allegation that Facon had "at least twice been offered and refused sex offender treatment" — which, if true, undercuts Facon's claim to have used his

time in prison to ameliorate his dangerous propensities and supports the validity of K.L.'s continuing fear of him.

Similarly, the judge also cited other facts about Facon's activities while in the highly regulated environment of prison — his "limited disciplinary infractions," "[t]he amount of time since any severe disciplinary infraction," and his employment and coursework — but did not explain why those activities supported a finding that Facon was rehabilitated and would not endanger others if released from such an environment. The same lack of explanation applies to the judge's reliance on Facon's "advanced" age (he was 57) and health problems; it may be true as a statistical matter that such facts correlate with a decline in violent criminal behavior, but that does not make them reliably predictive in the individual case. Finally, the judge cited Facon's "close relationships" with family members who had offered him their support upon his release. But the judge did not explain how this information about his family said anything about Facon's own rehabilitation and his receptivity to help from his family, or how the family members would lessen any danger he posed to other persons in the community.

In short, the judge asserted that the "balance favors the conclusion that [Facon] does not" pose a danger, but he did not explain why that was so. If the remand judge adheres to that conclusion, an explanation would be in order.

## V.

For the foregoing reasons, we vacate the judgment and orders granting Facon's motion for compassionate release and remand the case for further proceedings and a redetermination of Facon's medical eligibility and dangerousness. The parties should be afforded the opportunity to present updated evidence with respect to each of those issues.[69]

*So ordered.*

---

[69] *See Autrey*, 264 A.3d at 660 ("[T]here is no prohibition on successive motions for compassionate release, and given the ever-changing factual and scientific underpinnings of such motions, any one judgment is likely to have little if any preclusive effect on the next." (footnote omitted)). The United States has noted that the amended judgment in this case deviated from the motion judge's ruling (in that it would have provided for Facon to be on supervised release rather than probation) and neglected to address Facon's obligation to register as a sex offender. These concerns are moot for the time being, but the Superior Court should attend to them in the event it grants Facon's compassionate release motion on remand.